WILLIAM J. KONOP ET AL., APPELLANTS, V. FRED KNOBEL ET AL., APPELLEES.

92 N. W. 2d 714

Filed November 7, 1958. No. 34450.

*Dryden & Jensen,* for appellants.

*Tye, Worlock & Knapp,* for appellees.

Heard before SIMMONS, C. J., CARTER, MESSMORE, YEAGER, CHAPPELL, WENKE, and BOSLAUGH, JJ.

BOSLAUGH, J.

This litigation involves the ownership of an area of land 17 feet wide from north to south and 150 feet long from east to west immediately north of Lot 1 in the village of Odessa. The original sole plaintiff was William J. Konop but before the case was tried the court by order substituted Ethel H. Seiler and William F. Seiler as plaintiffs for and in the place of William J. Konop who had conveyed the real estate involved herein to them. The litigants in this controversy are Ethel H. Seiler and William F. Seiler, appellants, and Fred Knobel and Lottie E. Knobel, appellees. Lottie E. Knobel is not shown by the record to have an interest in the subject matter of the action except that which results from her marital relationship with Fred Knobel. He will be hereafter designated appellee.

A trial in the district court was had and as an incident thereof the premises were viewed by the court. The

case was taken under advisement and later the trial court found generally for appellees and against appellants and rendered a judgment of dismissal of the case. A motion of appellants for a new trial was denied and this appeal was prosecuted.

S. B. Halliwell, sometimes named and referred to in the record as Samuel Halliwell, was the owner of Lots 1 and 2 in the village of Odessa commencing with December 18, 1888, and thereafter until his death in the year 1939. The plat of the village of Odessa was vacated August 14, 1923, as to Lots 1 to 73, inclusive, in the village of Odessa, and all streets and alleys north of the north line of Odessa Street in that village. The effect of this was a vacation of all of the plat of the village north of the north line of Odessa Avenue. This vacated the plat as to Knobel Street which extended east and west immediately north of Lot 1 and the alley extending north and south through the block of which Lot 1 was the northeast lot of the block. Lot 2 adjoined Lot 1 on the south and Lot 8 was west of Lot 1 and was the northwest lot of the block.

S. B. Halliwell and his wife conveyed to Fred Knobel on February 26, 1926, what was before the vacation of the village plat the south 25 feet of the part of Knobel Street which adjoined Lot 1 on the north. This is described in the deed as the south half of Knobel Street.

Mary Lillian Birt, also named in the record as Lillian Birt, a daughter and one of the heirs of S. B. Halliwell, became the owner of Lot 1 and the north half of Lot 2 in the village of Odessa on December 31, 1943, by her purchase thereof at a partition sale and a deed to her from J. C. Tye, referee in the partition proceedings. The heirs of S. B. Halliwell were parties to the partition proceedings in which was involved real property owned by S. B. Halliwell at the time of his death, including Lot 1 and the north half of Lot 2 in the village of Odessa. Mary Lillian Birt, widow, conveyed Lot 1 and the north half of Lot 2 of the village of Odessa, and her interest

in the alley which adjoined the lots on the west, to William J. Konop June 23, 1951. He was unmarried and he conveyed the identical property to Edith H. Seiler and William F. Seiler, appellants, February 15, 1955. The land north of a line 17 feet north of the north line of what was Lot 1 in the village of Odessa was, after February 26, 1926, owned by Fred Knobel, appellee.

The issue for determination concerns the ownership of the 17 feet immediately north of and adjacent to the north line of Lot 1 in the village of Odessa as it was surveyed and platted. According to the record title it is owned by appellee. Appellants claim to own it by mesne conveyances, their adverse possession, and the adverse possession of their predecessors in title.

Appellee has lived all his life north of the village of Odessa in the vicinity of the land in litigation in this case. He was 69 years of age at the time of the trial in 1956. There were trees between his land and Lot 1 in the village of Odessa owned by S. B. Halliwell, hereafter referred to as Halliwell. The trees are described as willows and sometime later as willows and Chinese elms. Mention is also made of a plum thicket. It is probable that the original trees were planted in a row from east to west and that afterwards there was voluntary growth that grew into trees in an irregular pattern. There was a fence located and installed by Halliwell on the north of the original trees extending from east to west between his lot and the land of appellee. The fence consisted of 2 strands of barbed wire fastened to the trees and when there was no tree available, a post was put in to support the wire. There are very few of these trees still standing at the west part of the lot. The fence originally extended along the entire north edge of the block of which Lot 1 is a part. There was no one that had any concern with the properties mentioned herein that knew the true location of the north line of Lot 1 as it was surveyed and platted. The record does not show precisely when the fence was constructed.

Appellee testified that he farmed his land north of the fence for 46 years; that neither he nor Halliwell knew where the true line was; that Halliwell told appellee that the willows to which the fence wire was attached were on the north line of Lot 1 and appellee said he never doubted the word of Halliwell; that he and appellee never quarrelled or had disagreement about the north boundary line of Lot 1; and that appellee and Halliwell both considered the north line of Lot 1 was the fence line.

A witness said he was familiar with the fence and trees; that he assisted Halliwell in working on the fence about 50 years prior to the time of the trial; that it was on the north side of the trees; and that it extended east and west. He knew the fence was there for about 45 years. The fence was approximately on a ridge that formed on the ground. The ridge was at the time of the trial still visible to one viewing that location and it was seen and examined by the witness on the day of the trial. The ridge where the fence was located is 17 feet north of the true north line of Lot 1 in the village of Odessa.

A son of Halliwell has lived not more than 1 mile from and sometimes in Odessa for more than 40 years. He lived on Lots 1 and 2 in that village with his parents for a long time. He has known there was a fence north of a row of trees between the property which his father owned and the property of appellee since he was old enough to observe and remember such a fact. His knowledge in this respect has been for a period longer than 40 years. The trees and fence were along north of Lot 1. It was a barbed wire fence. There was a complete row of trees, mostly willows, from east to west. They did not last long but others came up from the roots and they occupied an irregular pattern over probably an area 8 feet wide. The trees died so that there were none for a considerable distance on the east but there continued to be a fence along where the trees had been.

Another witness who had lived in Odessa for about 35 years and knew the property in controversy since he was old enough to remember, stated that he played on the property of Halliwell as a boy; that there was a fence along the north side of the property, a remnant of which was there as late as 1951; that the fence was there, to his knowledge, for more than 20 years; that it consisted of barbed wire and posts and extended east and west the length of the Halliwell property; that there was a row of trees south of the fence; that the trees were willows; that later others sprung up of their own accord and covered a considerable area; that the new growth was not in a line as the first trees were; that the fence paralleled the trees and was straight from east to west; and that there were wild plum trees or bushes along a part of the fence and Halliwell picked and used the plums as his property.

A daughter of Halliwell bought Lot 1 and the north half of Lot 2 in the village of Odessa after the death of her father at a partition sale of the real estate owned by him when he died. The deed to her is dated December 31, 1943. She had possession and use of the real estate in issue in this case as owner thereof from that time until she sold and conveyed it in June 1951. There were trees along the north of the west half of the property and a fence along the trees during the time she owned it. There were trees along the north of the property when her father owned it and a fence east and west north of and adjacent to the trees that was fastened to them. The trees and fence were there for a great many years. They were supposed by the witness and her father to be on the north line of Lot 1. The fence was put there by her father and she knew it was there for more than 20 years. It was there as long as she could remember. There was never any dispute about the north line being where the fence was while her father was living or until after she conveyed the property in 1951. While she owned the property she used it for

garden and other purposes up to the trees and fence. Appellee used the property north of the fence but he had no possession or use of the property south of the fence and trees.

Appellants purchased Lot 1 and the north half of Lot 2 in Odessa in June 1951. The property was, for convenience, taken in the name of a son of Ethel H. Seiler and he conveyed it later to appellants. Ethel H. Seiler, hereafter spoken of as Mrs. Seiler, had known and was familiar with the property since 1943. She knew there was an old fence along the north part of the property which was pointed out to her as the north line thereof. There were trees for a considerable distance commencing at the west and extending eastward south of the fence. The fence was fastened to some of the trees and where there were no trees it was supported by posts. The fence extended east and west and was 17 feet north of the north line of Lot 1 as it was established by a survey made in the latter part of the year 1951. The fence and some trees were there when the survey was made. There was evidence on the premises that Halliwell and Mary Lillian Birt had used Lot 1 to the fence above described. The husband of Mrs. Seiler had knowledge of the property since 1946 at which time there was a fence along the north of it. There were wooden posts and 2 metal posts that were part of the fence at that time. There was an excavation on the north part which was about 1 foot or 2 feet from the fence. It had the appearance of having been an earthen cellar. The witness had hogs on the area in 1952 and there were then in evidence some of the posts and wire which had been a part of the fence north of the trees. The fence described by him was 17 feet north of the north line of Lot 1 as it was surveyed and platted. Appellants took possession of Lot 1 and the north half of Lot 2 in June 1951, moved a house thereon, and have since had the possession and use thereof except as interfered with by appellee after the correct

north line of Lot 1 was located by the survey made in the fall of 1951 at the instance of appellants.

Halliwell had the exclusive, unquestioned possession of and used the land in controversy in this case under a claim of ownership by him for more than 40 years prior to the time of his death in 1939. The fence north of it was recognized as the north line of Lot 1 by Halliwell and appellee during this period of time. Halliwell produced potatoes on the west half of Lot 1 for many years and he used the east half of the lot for garden purposes. He had a potato cellar near the fence which was north of the trees described above. The excavation referred to in the record was the location and remnant of the potato cellar. Halliwell maintained his possession and use of the land north to the fence and appellee occupied and used the land he owned south to the fence without claim of right to or ownership of the land south of the fence throughout the period above mentioned. The same situation was continued after the death of Halliwell by the persons who succeeded to his rights and ownership and by appellee until the true north line of Lot 1 in Odessa, as it was surveyed and platted, was determined by a new survey in the fall of 1951. The location of the north line of the lot as it was platted was not known by any of the interested parties until the 1951 survey thereof. It was then for the first time that appellee decided that the north line of the lot was not where the fence had been north of the trees and that he owned the land between the true north line of Lot 1 as established by the 1951 survey and the line where the fence had been north of the trees. The origin of the argument was when appellee cut down some trees, destroyed the grass of appellants on the disputed area, and asserted his ownership thereto.

The doctrine has long prevailed in this state that if a fence is constructed as a boundary line fence between two properties and if the parties concerned claim ownership of the land to the fence during the statutory

period without interruption in their possession or control during that time, they will acquire title by adverse possession to any land that was improperly enclosed with or added to the land they owned at the time the fence was constructed. Purdum v. Sherman, 163 Neb. 889, 81 N. W. 2d 331, states: "Where one by mistake as to the true boundary line enters upon and takes possession of lands of another, claiming it as his own to a definite and certain boundary, by an actual, open, exclusive, and continuous possession thereof under such claim for 10 years or more, he acquires title thereto by adverse possession." See, also, Worm v. Crowell, 165 Neb. 713, 87 N. W. 2d 384.

Halliwell conveyed the south 25 feet or the south half of Knobel Street, which adjoins Lot 1 on the north, to Fred Knobel February 26, 1926. The south 17 feet of this is the tract involved in this case. Halliwell maintained exclusive possession, control, and use, claiming ownership of it until his death in 1939, more than 10 years. The possession of this area by Halliwell, appellees argue, was permissive and subject to the rights of Fred Knobel. They say the possession of Halliwell during this period was not adverse to Fred Knobel because of the doctrine that if a grantor remains in possession of property after a conveyance of it, the possession of the grantor is presumed to be permissive and subject to the rights of the grantee and such possession cannot be adverse until notice of adverse claim is made known to the grantee. Walsh v. Walsh, 156 Neb. 867, 58 N. W. 2d 337. This principle is not decisive in the circumstances of this case. Halliwell had not actually claimed the 17-foot disputed tract. His possession, control, and use of it were based on a mistaken belief that the fence north of the trees was the true boundary line. Appellee had the same mistaken belief. Halliwell did not intend to have or continue in the possession of land which Knobel owned; neither did Knobel intend that Halliwell should. Halliwell and appellee continued the

precise situation and attitude in reference to the boundary line fence between their properties after the conveyance from the former to the latter for more than 13 years and until the death of Halliwell as that which existed between them before that conveyance was made. Halliwell's possession was not less adverse because he took possession of the land innocently and through mistake. His open, exclusive possession under claim of ownership constituted its adverse character and was notice to appellee of the adverse claim of Halliwell. In Purdum v. Sherman, *supra,* the court said: "The plaintiffs contend, however, that the defendant Sherman had never actually claimed the disputed tract and that her use of it was based only on a mistaken belief that the west fence on the railroad right-of-way was the true boundary line. The evidence sustains this contention. The fact that one claiming title by adverse possession never intended to claim more land than is called for in his deed is not a controlling factor. It is the intent with which possession is held rather than an intention to hold in accordance with his deed that is controlling. The claim of adverse possession is founded upon the intent with which the occupant had held possession, and this intent is ordinarily determined by what he has done in respect thereto. * * * The rule is stated in Annotation, 97 A. L. R., p. 58, as follows: 'In a steadily increasing number of jurisdictions, the possession is the important element, and it is held that such possession is not the less adverse because the person takes possession of the land in question innocently and through mistake. In other words, it is the visible and adverse possession, with an intention to possess land occupied under a belief that it is the possessor's own, that constitutes its adverse character * * *. Or, as said in 1 R. C. L. 733, "the mere fact of possession is allowed to override the intention; and it is held that a possession beyond the true boundary lines, irrespective of the intention with which it was taken, becomes adverse." ' * * * It is evident, there-

fore, that while defendant Sherman did not know where the true boundary was, as shown by her deed, she occupied and used the disputed tract for grazing purposes for more than 10 years under the belief that the west fence on the railroad right-of-way was the boundary. It is evidence which establishes a use showing actual, open, exclusive, and continuous possession, and when such use has existed for the statutory period of 10 years, it is sufficient to sustain a claim of title by adverse possession."

There were statements made by Mary Lillian Birt while she was a witness to the effect that she did not at any time "claim to own that part of the street North of Lot 1," referring to Knobel Street, and that at no time did she ever "claim anything North of the actual lot line * * *." There were other similar assertions made by her. Appellees, because of these, assert that she did not claim to have had adverse possession of the tract involved during the period she owned Lot 1 from December 31, 1943, to June 23, 1951. Her statements in this respect are not conclusive. Her acts concerning the property were inconsistent with her asserted intention. In Hallowell v. Borchers, 150 Neb. 322, 34 N. W. 2d 404, it is said: "With reference to the testimony of the defendants to the effect that the plaintiffs made no claim to any other land than to the true boundary line, * * * it is clear that not too much importance should be attached to what an occupant may claim on the witness stand on this point, particularly when it is apparent that his testimony is altogether inconsistent with his acts and conduct during the period of his possession. Any honest witness * * * would be likely to answer a question as to whether he claims more than to the true boundary in the negative, and would not be likely to think of qualifying it by stating that the true boundary of which he speaks is the boundary as appears to him to be the true one." See, also, Purdum v. Sherman, *supra*.

Appellants say in their brief that the question in-

volved in this case is are they "entitled to a decree quieting title to a 17 foot strip of land to the North of their legal lot line"? They state or refer to no other question in the case. It is said that the judgment is contrary to law and contrary to the evidence. There is no assignment concerning the absence of a judgment for any amount of money in favor of appellants and against appellee. There is no discussion in the brief in reference to any right of appellants to recover any amount of money from appellees. In the last paragraph it is asserted that plaintiffs (appellants) are entitled to damages because of loss of the trees in accordance with the prayer of the petition. The prayer of the petition in this regard is "that this plaintiff have and recover from the defendants and each of them the sum of $1500.00." The petition contains on this subject only the allegation "that said property has been depreciated in value by the cutting down of said trees at least the sum of $1500.00." The words "said property" therein, as shown by the context, definitely refer to the land of the plaintiffs. The only allegation concerning damages is that the land had depreciated $1,500 because trees had been cut therefrom. There is no evidence in the record as to the value of the land with the trees growing thereon immediately before they were destroyed, or of the value of the land without the trees. There is no evidence to support the allegation of the petition in this respect. If it was intended to claim recovery for the loss of the trees as such, then there is no pleading to support any recovery on that basis. The allegation of a pleading and the proof offered must agree. A litigant may not allege a basis of recovery and on trial rely upon proof tending to establish a different basis for recovery. Shepardson v. Chicago, B. & Q. R. R. Co., 160 Neb. 127, 69 N. W. 2d 376; National Fire Ins. Co. v. Evertson, 153 Neb. 854, 46 N. W. 2d 489.

The judgment should be and it is reversed and the cause is remanded to the district court for Buffalo County with directions to render a judgment quieting title in fee

to the real estate, the subject of this action, in appellants. REVERSED AND REMANDED WITH DIRECTIONS.